[979 NYS2d 34]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PATRICK THOMAS, Appellant.

First Department, January 16, 2014

## APPEARANCES OF COUNSEL

*The Legal Aid Society*, New York City (*Steven Banks* of counsel), and *Primmer Piper Eggleston & Cramer*, Manchester, N.H. (*Matthew J. Delude*, of the bar of the State of Connecticut, admitted pro hac vice, of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Yuval Simchi-Levi* and *David M. Cohn* of counsel), for respondent.

## OPINION OF THE COURT

MANZANET-DANIELS, J.

Police officers observed defendant and his companion, William Brown (*see People v Brown*, 115 AD3d 38 [2014] [decided herewith]), running across Broadway, in the Times Square area, at approximately 4:40 a.m., "looking over their shoulder[s]." No crime had been reported, the officers did not see anyone chasing the two men, and no apparent contraband was visible.[1]

The motion court denied defendant's motion to suppress the identification and property seized from him incident to arrest, finding that the police had reasonable suspicion to stop defendant and Brown when they observed them "moving at a significant pace . . . looking over their shoulders . . . as if to see if they were being followed." The court noted that "[b]oth Officer Carey and Sergeant Monahan knew from prior contacts that Mr. Brown engaged in fraudulent accosting in that area," and reasoned that "someone knowing of Mr. Brown and his prior criminal activities [would] believe that he had engaged in some sort of scam, and was fleeing a scene." The court found that "[t]he fact that [defendant Thomas] was with Mr. Brown and

---

**1.** I am in substantial agreement with the more detailed recitation of facts in the dissent.

mimicking his conduct provided reasonable susp[icion] that he had engaged in whatever conduct Mr. Brown had committed." We now reverse.

A level three forcible stop is constitutional only if the police have a "reasonable suspicion that a particular person was involved in a felony or misdemeanor" (*People v Hollman*, 79 NY2d 181, 185 [1992]). In determining whether the police officers had the requisite reasonable suspicion, only the information known to the officers prior to the forcible stop is relevant (*see People v Cantor*, 36 NY2d 106, 111 [1975]).

The officers' knowledge of defendant Brown's prior criminality in the same neighborhood was not sufficient to give rise to reasonable suspicion justifying a level three intrusion as to Brown; perforce, knowledge of Brown's prior criminality was insufficient to justify a level three intrusion as to *defendant*, who was merely in Brown's company and was not even known by the officers to have a criminal record. The police sergeant only knew defendant by face, and the officer did not know defendant personally and had never arrested him. Contrary to what is asserted by the dissent, there is no evidence that the police officers knew defendant to have victimized people in the area. The motion court, in denying defendant's motion to suppress, appears to have endorsed a theory of "guilt by association," which must vigorously be rejected.

"[A] stop based on no more than that a suspect has previously been arrested . . . is premature and unlawful and cannot be justified by subsequently acquired information resulting from the stop" (*People v Johnson*, 64 NY2d 617, 619 [1984]). In *Johnson*, the defendant, a known burglar, was stopped by officers who observed him walking around and looking at houses in an area where previous burglaries had occurred. The Court of Appeals held the stop unlawful, reversed, and granted the motion to suppress.

Likewise, in *People v McCullough* (31 AD3d 812 [3d Dept 2006], *lv denied* 7 NY3d 850 [2006]), the defendant, who was known to the officer as a result of previous arrests for trespass and possession of a controlled substance, was observed coming from the backyard of a building known for narcotics dealing. Upon seeing the police, the defendant stopped, turned, and ran. The Third Department held that the police lacked reasonable suspicion to pursue the defendant, and granted the motion to suppress.

This Court, in *People v Boulware* (130 AD2d 370 [1st Dept 1987], *appeal dismissed* 70 NY2d 994 [1988]), stated that an of-

ficer's belief that the defendant has had previous arrests is an insufficient basis on which to find an objective suspicion of criminal activity, reasoning that "[t]o hold otherwise would be to exclude all persons with arrest records from the protection of the Fourth Amendment and render them subject to arbitrary stops and inquiries" (*id.* at 373). An officer's surmise as to a person's propensity to commit crime, in the absence of objective indicia that a crime has taken or will be taking place, is an insufficient constitutional predicate (*id.*).

As *Johnson* and *Boulware* make clear, the officers' knowledge of Brown's criminal past is not tantamount to an "indication of criminal activity."[2] This logic is even more compelling as to defendant, who was not even known to have a criminal past, and was assumed guilty by mere association with Brown.

The fact that the officers observed defendant and Brown running does not elevate the level of suspicion. Flight, accompanied by equivocal circumstances, does not supply the requisite reasonable suspicion (*see People v Holmes*, 81 NY2d 1056 [1993]). The police did not observe conduct indicative of criminality, nor did they even possess information that a crime had occurred in the area. The cases relied on by the People are readily distinguishable insofar as they involve flight coupled with other factors (*see e.g. People v Poh Wong*, 204 AD2d 111 [1st Dept 1994] [defendant running through the streets of Chinatown, looking over his shoulder, along with man holding a revolver], *lv denied* 84 NY2d 835 [1994]).

Accordingly, the judgment of the Supreme Court, New York County (Thomas Farber, J., at dismissal motion; Michael R. Sonberg, J., at suppression hearing; Cassandra M. Mullen, J., at jury trial and sentencing), rendered June 22, 2011, as amended July 20, 2011, convicting defendant of grand larceny in the third and fourth degrees and fraudulent accosting, and sentencing him, as a second felony offender, to an aggregate term of $3^{1}/_{2}$ to 7 years, should be reversed, on the law, the motion to

---

**2.** The cases relied on by the People for the proposition that a defendant's criminal history is relevant to the reasonable suspicion calculus are distinguishable (*see e.g. People v Teasley*, 88 AD3d 490 [1st Dept 2011] [officer recognized defendant from wanted poster], *lv denied* 19 NY3d 977 [2012]; *People v Lynah*, 56 AD3d 375 [1st Dept 2008] [defendant, whom officer recognized from recent drug investigation, observed holding a plastic bag and counting something], *lv denied* 12 NY3d 760 [2009]; *People v Rivera*, 50 AD3d 458 [1st Dept 2008] [recognizing defendant's vehicle from a previous narcotics surveillance operation, officers followed defendant, stopping him only after observing a drug transaction], *lv denied* 11 NY3d 740 [2008]).

suppress the out-of-court identification and property seized from defendant granted, and the matter remanded for a new trial preceded by an independent source hearing.

SAXE, J. (dissenting). The majority's decision goes far beyond protecting against unreasonable searches and seizures. By disapproving of the stop of defendant, in which officers took reasonable steps based on the combination of facts known to them, this Court is discouraging police work that is not only constitutionally proper but also laudable. Such a precedent will serve to impede effective law enforcement and interfere with the protection and safety of the public.

While this appeal and the appeal of codefendant William Brown (*see People v William Brown*, 115 AD3d 38 [2014]) have been heard separately, the question of whether the police were justified in stopping and detaining each of the two men requires consideration of what the police officers knew at the time with regard to both men. In both appeals, based on the testimony at the suppression hearing, the police were justified in detaining the two men based on all the information known to the officers at the time. Although the officers had less prior knowledge regarding *this* defendant, Patrick Thomas, and had not observed him, as they had Brown, lingering in front of the Lace nightclub earlier that night, they were justified in their stop of *both* men by their observations of the two combined with the information then in their possession. Moreover, I would reject, as unreasonable and illogical, any suggestion that the police could properly entertain a reasonable suspicion that William Brown had just committed a crime in front of the Lace nightclub, based on their aggregate knowledge of his criminal history, his presence and conduct in the area that night, and his apparent flight from the location of Lace at a suspiciously late hour, but could not properly extend that suspicion to the man running next to Brown at 4:30 a.m., similarly looking back over his shoulder, when the second man was known to one of the officers—by face, if not by name—as an associate of other individuals who, like Brown, were known to victimize people at that location. I would therefore uphold the denial of both defendants' suppression motions and affirm their convictions.

Facts

At the suppression hearing, Police Officer Edward Carey testified that in the early morning hours of December 9, 2010, he was on uniformed patrol with Sergeant Kenneth Monahan and

Police Officer Thomas Donovan near Times Square in an unmarked police van. The officers were assigned to the Cabaret Unit, which specialized in identifying crimes committed around bars and nightclubs. Officer Carey had seen codefendant William Brown numerous times on prior occasions while patrolling the Times Square area; in fact, Officer Carey had arrested Brown on two previous occasions for fraudulent accosting—that is, engaging in scams, usually targeting single men coming out of so-called gentlemen's clubs, such as Lace or Flashdancers. Sergeant Monahan testified that he had previously seen both defendant and Brown "numerous times" in front of the Lace nightclub, located on Seventh Avenue near 49th Street. Monahan knew defendant by face and Brown by name. He knew the two men to associate with the same individuals, and although he had never seen defendant and Brown together, he knew that they both "victimized" people at that location.

Importantly, at around 1:00 or 1:30 a.m. that night, Officer Carey observed Brown in front of Lace, and got out of the police vehicle to speak directly to him, instructing him to leave the area.

A few hours later, at around 4:30 a.m., the three officers were driving south on Broadway between 49th and 48th Streets when they observed defendant and Brown running diagonally across Broadway, through the middle of the street, crossing directly in front of the officers' unmarked van, and looking over their shoulders, back toward the corner of 49th Street and Seventh Avenue, where the Lace nightclub was located. Officer Carey testified, "I looked at the sergeant and said I believe, and he had the same feeling I had, that some type of crime had occurred. And I said, do you know what, we'll stop them." Officer Carey also testified that he observed aloud to his fellow officers that one of the men was Willie Brown, and that it looked like the men had done something.

Sergeant Monahan promptly stopped the van; Carey and Donovan exited, and stopped the two men in front of a hotel located at 1605 Broadway. Meanwhile, Sergeant Monahan drove around the corner toward Lace, where he saw a man standing in front of 723 Seventh Avenue, next door to the club. Sergeant Monahan drove up to the man and asked if anything had been taken from him; the man replied, "[T]hey took my watch." Sergeant Monahan then drove the victim to 1605 Broadway, where defendant and Brown were being held, arriving only a minute or two after the two men were detained. Upon viewing defendant

and Brown from the van, the victim stated, "[T]here they are." One of the officers asked defendant and Brown, "[W]here's the watch?" and in response, defendant reached into his pants pocket and produced a silver Rolex watch.

## Discussion

To forcibly detain a defendant, the police must have "reasonable suspicion" that a crime has been committed; reasonable suspicion is defined as the "quantum of knowledge [sufficient] to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand" (*see People v Brannon*, 16 NY3d 596, 602-603 [2011] [internal quotation marks omitted]; *People v Martinez*, 80 NY2d 444, 447 [1992]; *People v De Bour*, 40 NY2d 210, 216, 223 [1976]). "A stop based on reasonable suspicion will be upheld so long as the intruding officer can point to 'specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion' " (*Brannon*, 16 NY3d at 602).

The majority relies on cases holding that certain types of knowledge, absent more, fail to rise to the level of reasonable suspicion. One of those lines of cases stands for the well established proposition that the officers' mere knowledge of the defendant's prior criminality does not give rise to reasonable suspicion justifying a stop (*see People v Johnson*, 64 NY2d 617, 619 [1984]). Another line of cases holds that "[f]light alone, . . . or even in conjunction with equivocal circumstances that might justify a police request for information, is insufficient to justify pursuit because an individual has a right 'to be let alone' and refuse to respond to policy inquiry" (*People v Holmes*, 81 NY2d 1056, 1058 [1993] [citations omitted]; *see also People v May*, 81 NY2d 725, 727-728 [1992]).

However, each of those factors, prior criminality and flight, *may* serve as components of the total quantum of knowledge that would lead a reasonable person under the circumstances to believe that "criminal activity is at hand." A defendant's criminal history, or even an officer's recognition of a defendant from an earlier investigation, may be a factor in assessing reasonable suspicion (*see e.g. People v Lynah*, 56 AD3d 375 [1st Dept 2008], *lv denied* 12 NY3d 760 [2009]). Similarly, "[f]light, combined with other specific circumstances indicating that the suspect may be engaged in criminal activity," may provide the necessary predicate to stop and detain a defendant (*People v Holmes*, 81 NY2d at 1058).

The majority suggests that this matter is comparable to *People v Boulware* (130 AD2d 370 [1st Dept 1987], *appeal dismissed* 70

NY2d 994 [1988]) and *People v McCullough* (31 AD3d 812 [3d Dept 2006], *lv denied* 7 NY3d 850 [2006]), where the police lacked reasonable suspicion to pursue or stop the defendants. I disagree; in both those cases, the conduct of the defendant was innocuous, a description that cannot reasonably be applied here.

In *People v Boulware*, police officers noticed a group of 10 to 15 people on a corner, at 11:15 p.m., in an area that had a high incidence of drug-related and weapons arrests; two of the officers attempted to disperse the crowd, while one officer began to approach one of those individuals, the defendant, whom he knew to have a lengthy arrest record for gun possession offenses, intending to question him. However, when the officer called out that he wished to speak to the defendant, the defendant placed his right hand into his right coat pocket as he turned to face the officer. The officer ordered the defendant to remove his hand from his pocket, but the defendant refused, and when the officer took a step toward him, the defendant fled. This Court explained that the police had lacked even a common-law right of inquiry, because "[t]here was a total absence of specific objective indicia of criminality. Defendant's conduct was totally innocuous. He was simply standing on a street corner with others" (130 AD2d at 373).

In *People v McCullough*, the officer observed the defendant coming from the backyard of premises where the officer had previously arrested the defendant for trespass and possession of a controlled substance, and had numerous times ordered him off the premises without arresting him. When the defendant saw the police, he stopped, turned, and ran, and the officer pursued and arrested him. The arrest was held to have been made without sufficient justification. The Court explained that while pursuit was justified where the police have "observed specific conduct indicating that the suspect may be engaged in criminal activity," the police had observed no such conduct (31 AD3d at 813). Rather, the defendant had engaged only in "[f]light alone," or, at most, flight "in conjunction with equivocal circumstances" (*id.*). While the police knew that the defendant had sold drugs in the past, all they observed on the day in question, at most, was a possible violation of Penal Law § 140.05, a violation rather than a criminal offense; they had neither information nor any other basis on which to infer that the defendant had just been engaging, or was about to engage, in any form of criminality.

The case of *People v Johnson* (64 NY2d 617 [1984]) also involved police observations of innocuous behavior by the de-

fendant. The defendant was a known burglar who the police saw walking and looking at houses in an area that had experienced a rash of burglaries; the Court held that his act of looking at houses, even combined with the knowledge of his previous burglary arrests, "provide[d] no sufficient bases to infer criminal activity had been or was about to be undertaken" (64 NY2d at 619).

The conduct of the defendant standing in a crowd in *Boulware* was innocuous, as was the conduct of the defendant merely walking through a building's yard in *McCullough*, and the conduct of the defendant looking at houses in *Johnson*. Here, in contrast, the conduct of the two men was far from innocuous, and the circumstances far from equivocal. Rather, the officers' observations here were of conduct by defendant and codefendant that was inherently suspicious, which, in light of the officers' prior knowledge of them, justified the reasonable belief that the two men were probably running from a scene at which they had just engaged in criminal activity.

Had Sergeant Monahan and Officer Carey merely seen two people whom they did not recognize running across Broadway at around 4:30 a.m., darting through traffic and looking back over their shoulders in the direction of 7th Avenue and 49th Street as if fearful of being chased, the officers would have been justified in having some suspicions that the two people might have been running from the site of a recent commission of a crime; but they would not have had reasonable suspicion to forcibly stop the men (*see People v Velasquez*, 217 AD2d 510, 511 [1st Dept 1995], *lv denied* 87 NY2d 852 [1995]). Here, however, the information possessed by the officers at the time they observed the two men running elevated any mere suspicions into reasonable suspicion that these two men were running away from the scene of a crime they had just committed in the vicinity of the Lace nightclub.

The officers recognized the two men. They knew that Brown had a history of operating scams and victimizing tourists in the vicinity of the Lace nightclub, and they knew defendant to associate with other people who engaged in such scams. This knowledge made it more reasonable for the officers to conclude that the two men were running away from the scene of a crime they had just committed in the vicinity of Lace, rather than to conclude that they were running for some other, innocuous or noncriminal reason. Also, importantly, since Officer Carey had observed Brown near the Lace nightclub earlier that night, and,

knowing his history, had directed him to leave, the officer's observation of Brown running away from the area where he had been loitering earlier, near the Lace nightclub, gave him further reason to conclude that Brown had been in the area, all along, to engage in another scam that night, and that he had just committed such a scam.

Admittedly, the quantum of information in reasonable suspicion cases often includes observations by the police of some physical indicia of crime. For example, in *People v Martinez* (80 NY2d 444 [1992]), the police saw the defendant, at night, in an area known for a large amount of drug activity, removing a Hide-a-Key box known to be used as a drug stash from the steel grate of a store window. The Court held that the police had a reasonable suspicion of criminal activity, considering the defendant's flight from the police in conjunction with the "other attendant circumstances, namely, the time, the location, and the fact that [the] defendant was seen removing an instrument known to the police to be used in concealing drugs" (*id.* at 448).

Nevertheless, observation of a physical object generally associated with a crime is not a sine qua non of reasonable suspicion. That the police here did not observe defendant or his codefendant holding any proceeds of a crime does not preclude a finding of reasonable suspicion under these circumstances.

Finally, the stop and detention of defendant along with Brown is not the equivalent of detaining defendant based on "guilt by association." Defendant was not merely standing innocently beside a person of whom the police had reasonable suspicion; he was running alongside Brown, similarly checking back over his shoulder in the direction of the Lace nightclub. Accepting that the police had sufficient grounds for reasonable suspicion that Brown had just committed a crime, it was equally reasonable for the police to conclude that defendant had participated in that crime with Brown. This would be so even if they had no other knowledge of defendant, but here, Sergeant Monahan also knew that defendant associated with others who perpetrated scams like Brown's, giving the officers additional reason to stop both men.

I would therefore conclude that the police acted properly in forcibly stopping the two men while they ensured that a crime had indeed been committed and arranged for a showup identification by the victim, a process that took mere minutes to complete. The brevity of the detention is yet another factor demonstrating that the officers acted reasonably (*see People v*

*Hicks*, 68 NY2d 234, 241-244 [1986]; *People v Encarnacion*, 191 AD2d 374 [1st Dept 1993], *lv denied* 81 NY2d 1072 [1993]). Notably, too, the officers had no reasonable alternative course of action. They were confronted with a fast-moving situation that required immediate action; these experienced officers made a reasonable, split-second decision, choosing the only plausible way to investigate inherently suspicious circumstances.

GONZALEZ, P.J., and GISCHE, J., concur with MANZANET-DANIELS, J.; TOM and SAXE, JJ., dissent in an opinion by SAXE, J.

Judgment, Supreme Court, New York Court, rendered June 22, 2011, as amended July 20, 2011, reversed, on the law, the motion to suppress the out-of-court identification and property seized from defendant granted, and the matter remanded for a new trial preceded by an independent source hearing.